EXHIBIT  A

# GZA GeoEnvironmental, Inc.

AGREEMENT made as of December 6, 2012, by and between BROADWAY 371, LLC, a New York limited liability company with offices located at 575 Madison Avenue, 22nd floor, New York, New York 10022 (the Owner) and Goldberg Zoino Associates of New York PC, a New York corporation, with its principal place of business located at 104 W. 29th Street, 10th Fl., New York, NY 10001 (the Consultant).

## Article 1 - Scope of the Project

1.1     The Owner intends to develop and construct a first class luxury condominium complex at the real property located at 5 Franklin Street a.k.a. 371 Broadway, New York, New York, consisting of a 19 story structure which will include residential condominium units, lobby and building amenities like a rooftop swimming pool and gym, all totaling approximately 122,000 gross square feet (the Project).  The Owner intends for the Project to be consistent in design and quality to similar-use, first-class projects found in the New York City area.  The Owner has engaged the Consultant to perform geotechnical engineering, design, inspection, and instrumentation installation services, including, but not limited to, providing the labor and material for the installation of geostructural instrumentation to monitor 365 Broadway to the south of the Project and 373-375 Broadway to the north of the Project, to the extent, and under the terms and conditions, set forth in this Agreement and in accordance with the Consultant's proposals dated December 3, 2012 and revised by Owner on December 5, 2012, copies of the modified Consultant's proposals are collectively attached hereto as Exhibit A and made a part of this Agreement (collectively referred to as the Consultant's Proposal).  In case of conflict, inconsistency or confusion between the Consultant's Proposal and this Agreement, the terms and conditions of this Agreement shall exclusively control in all respects.

1.2     Generally, the Consultant's Fee for Basic Services, which terms are fully defined in this Agreement, is premised on the understanding that the Consultant will provide those Basic Services outlined in this Agreement and the Consultant's Proposal with respect to the entire area of the Project.  Further, the Consultant shall comply with all requirements of the New York City Department of Buildings (DOB), New York City Mass Transit Authority (MTA), New York City Transit (NYCT) and Occupational Safety and Health Administration (OSHA).  Generally, the Consultant's Fee is for the Basic Services scope of work set forth in the Consultant's Proposal, under the terms of this Agreement, together with all other customarily related professional services, consulting work and services (collectively, the Work).

1.3     Owner has entered into an agreement with Design Construct International, Inc. (the Construction Manager) to perform construction management services on behalf of and as agent for Owner in connection with the Project.  As agent for Owner, Construction Manager shall not be responsible or obligated under this Agreement to Consultant, including for payment and liability obligations, and Consultant agrees to look solely to Owner for the fulfillment of all such obligations under this Agreement.  Consultant hereby acknowledges and agrees to follow directions from Owner and/or Construction Manager with respect to the Work and shall keep both Owner and Construction Manager apprised of any and all developments and updates related to Consultant's Work.  All correspondence from Consultant shall be sent to the attention of both the Owner and Construction Manager.  Construction Manager has reviewed this Agreement and the Exhibits hereto and acknowledged that the Consultant's proposed scope of work is complete and accurate.

**Article 2 - Professional Services**

2.1     The services to be provided by the Consultant are more fully described in Exhibit A and in a scope of work to be provided by Owner when services are needed, and are hereinafter referred to as Basic Services or Work.

2.2     The Consultant shall assign sufficient staff to work on the Basic Services to assure that its obligations under this Agreement are carried out in accordance with the Project Schedule set forth in Exhibit B. The Consultant shall assign only fully qualified, experienced and competent regularly-employed employees to work on the Basic Services and shall remove, at the request of the Owner, any staff person assigned to the Project that the Owner shall deem unfit to perform the task assigned to him or otherwise finds objectionable. Consultant hereby confirms that it has adequate staffing to fully and timely perform all of the duties and responsibilities described in this Agreement. Additionally, Consultant hereby confirms and certifies that such staff assigned to this Project and performing any of the Work is licensed in the State of New York and by any other licensing or regulatory body having jurisdiction over the Work. Any such individuals shall perform the surveying services required by this Agreement pursuant to applicable laws and in accordance with professional standards applicable to similar projects in the New York metropolitan area. The Consultant will obligate any consultants retained by it, if any, to also perform their services pursuant to such laws and in accordance with such professional standards and to be duly licensed in the State of New York.

2.3     All services provided by the Consultant shall be accomplished in a manner consistent with the professional standards of skill, care and judgment utilized by other professionals performing similar professional and other services for projects located in Manhattan of similar quality and stature to the Project.

2.4     The Consultant shall be responsible for and represents that all reports, results, testing, drawings and specifications prepared and/or reviewed by the Consultant in performing the Work conform to all applicable governmental regulations, statutes, rules and ordinances, including, but not limited to, any requirements of any governmental agencies having jurisdiction over the Project. The Consultant agrees to use such forms, produce any documentation, and provide services in connection with the production of such documentation related to the Project or otherwise fully satisfy the requirements of any public agency, including, but not limited to, the DOB, MTA, NYCT, OSHA, zoning, quasi-public agency, regulatory agency, financing entity or other party with jurisdiction over the Project or its financing. If applicable, the Consultant will assist in the preparation of any documents to be filed with such agencies and will provide all necessary information for the code consultant to obtain approvals. The Consultant shall not attempt to transfer its obligation under this Article to any other entity involved in the Project.

2.5     The Consultant shall attend job meetings with the design team and/or engineers, as required and as requested by the Owner, and/or the Architect of Record, ODA-Architecture, P.C. d/b/a Office for Design & Architecture, with offices located at 494 Broadway, 3rd Floor New York, New York 10012 (the Architect).

2.6     Deliverables from the Consultant will include, but are not limited to all those items listed in Exhibit A, as well as any other related reports.

2.7     The Consultant will participate in pre-construction or installation conferences, if requested, and review shop drawing submittals. The Consultant will visit the Project and attend construction team meetings as required or as mutually agreed to by the Owner and the Consultant. The purposes of these visits and meetings are as follows:

2

(a)   To become generally familiar with the progress and quality of Work completed and to keep the Owner informed of the Consultant's findings;

(b)   To assist the Owner in identifying defects and deficiencies in the Work; and

(c)   To determine, in general, if the Work is being performed in a manner that indicates that, when fully completed, the Work will be in accordance with the drawings and documents created by the Consultant for construction (the Construction Documents).

2.8   Following each and every site visit by the Consultant, as required under Article 2.7, the Consultant shall prepare and submit to the Owner a detailed written report of the Consultant's findings and/or observations, including, but not limited to, its findings in connection with its obligations under Article 2.7 (with recommendations).

2.9   The Consultant shall check, review, coordinate and advise on shop drawings and samples to assure that they are in conformity with the approved Construction Documents and all building code requirements.

2.10   The Consultant shall deliver to the Owner in electronic and hard copy format, at the conclusion of its services hereunder, copies of the final reports, construction drawings, sketches, addenda, bulletins, field directives and specifications and other work product created or used by the Consultant and its consultants in the performance of its obligations under this Agreement (collectively, Work Product). The Owner shall have the right to review and request copies of all documentation for the Project.

2.11   The Consultant, upon request by the Owner and/or the Architect, shall furnish, in writing, interpretations of the Construction Documents which are necessary for the proper execution and progress of the Work.

2.12   The Consultant shall assist the Architect in determining whether the Architect shall reject work at the Project which does not conform to the Consultant's Construction Documents or whether additional testing or inspection is required.

2.13   The Consultant shall provide certain Additional Services, first requested by the Owner in writing (which services are not included as Basic Services), for which the Owner shall compensate the Consultant in accordance with Section 5.4, provided that the Consultant has first notified the Owner in writing of its intention to provide such services as "Additional Services," its explanation for the reasons therefore, its price for the performance of such services and provided further that such Additional Services are not necessitated by the Consultant's error or omission and the Owner authorizes same in writing. The procedures for the approval of Additional Services are a condition precedent for payment for those Additional Services and, accordingly, the Consultant's failure to follow the procedures for Additional Services contained in this Section 2.13 constitute a waiver of additional compensation for the Additional Services.

**Article 3 - Time for Performance**

3.1   The Consultant acknowledges its understanding that timely design, construction and completion of the Project is of critical importance to the Owner. Accordingly, time is of the essence with respect to all aspects of the Consultant's performance hereunder and the schedule provided in Exhibit B. The Consultant agrees that it shall diligently endeavor to

3

CIC 000152

perform its services in accordance with the Project Schedule and that it shall diligently endeavor to recapture any delays to the time limitations established therein which are due to factors within the control of the Consultant without entitlement to any additional fees whatsoever.

**Article 4 - Ownership of Work Product**

4.1    Upon payment for Services rendered, all reports, plans, drawings, specifications, models, opinions and other material prepared or furnished pursuant to this Agreement and all rights therein (Consultant's Documents) shall be the property of the Owner, constituting "works for hire," starting from their creation and inception through their acceptance by the Owner or upon the suspension or termination of the Project or the termination of this Agreement. Reproducible copies in both electronic and hard-drawn format of all plans, drawings and specifications and all other such materials shall, to the extent not previously delivered, be promptly delivered to the Owner upon demand. The Consultant hereby assigns to the Owner any and all copyright interests in and to Consultant's Documents (including all rights to create derivative works there from) which may arise under federal, state or common law.  On demand of the Owner and/or their respective lenders, original renderings, special art work and models shall be promptly delivered by the Consultant.  All plans, drawings, specifications and all other such materials may be used by the Owner and/or their respective lenders, in whole or in part or in modified form, for such purposes as such party may deem advisable, without further employment of, or payment of additional compensation to, the Consultant or any consultant, provided however that any use, re-use or misuse shall be at the sole risk of the user without any liability to Consultant.  Consultant's Documents shall be the property of the Owner whether or not the Project is actually constructed; however, the drawings and specifications shall not be used by the Owner or the Consultant for any other project.

4.2    No page of any report, design, plan, drawing or specification shall be considered as approved by the Owner unless it is either (i) signed or initialed by a duly authorized representative of the Owner or (ii) expressly approved by the Owner in writing.  A duplicate copy of each such approved sheet shall be kept in the respective offices of the Owner and the Consultant. Approval by the Owner of any drawings, documents or other work prepared by the Consultant under this Agreement shall not relieve the Consultant of its responsibility under this Agreement or for any act or omission in the performance of its professional duties hereunder.

**Article 5 – Compensation**

5.1    The Owner shall pay to the Consultant for the Basic Services described herein a fee (including all applicable taxes) as follows:

(a)    A lump sum fee of Fifty-One Thousand One Hundred Dollars ($51,100.00) for all Basic Services related to the Automated Motorized Total Stations (AMTS) Monitoring System which includes, but is not limited to, all labor, surveys, maintenance, installation, equipment rental fees, site visits, monitoring reports, etc.

(b)    A lump sum fee of Seventeen Thousand Nine Hundred Dollars ($17,900.00) for all Basic Services related to the preconstruction survey, survey monitoring and vibration monitoring of the NYCT tunnel structure which includes but is not limited to, all labor, surveys, maintenance, installation, equipment rental fees, site visits, monitoring reports, etc.

4

CIC 000153

      (c)    A lump sum fee of Twenty-One Thousand Seven Hundred Dollars ($21,700.00) for all Basic Services related to the geotechnical pile design and testing services which includes but is not limited to, all labor, surveys, maintenance, installation, equipment rental fees, site visits, monitoring reports, etc.

Progress payments for Basic Services shall be payable based on the percentage of work provided for each service, in accordance with the Consultant's Proposal.

5.2    The Consultant shall also be entitled to reimbursement for its direct actual out-of-pocket costs for travel, long-distance telephone charges, photographs, lab analysis and testing, blue-printing and other reproduction costs and messenger service. Notwithstanding the above, the Consultant must obtain prior written approval for any expense for which reimbursement is sought in excess of $250. The Owner will not reimburse the Consultant for expenses outside the categories provided for in this Section 5.2.

5.3    The Owner shall pay the portion of the fee due for services performed, together with approved expenses that are reimbursable under this Agreement, upon payment applications submitted on a monthly basis, within thirty (30) days after receipt by the Owner of payment from their respective lenders covering such fees and expenses. As a condition to receipt of each monthly payment, the Consultant shall execute such documentation, including release of lien rights to the extent of payments made and to be made that month, including as necessary and appropriate to satisfy any requirements to which the Owner is subject by governmental agencies, lenders, or others with jurisdiction or other cognizance of the Project.

5.4    The Owner shall compensate the Consultant for Additional Services provided in accordance with Section 2.13, at hourly rates which shall be pre-approved in writing by Owner, if applicable, or other basis mutually agreed upon in writing, provided the Consultant has advised the Owner in writing before such services are performed that they are beyond the scope of Basic Services and such services have been specifically authorized by the Owner in writing in advance of their performance, and further provided that the written notification given to the Owner includes a printout of the estimated man-hours (including a not to exceed amount) together with the names and titles of personnel proposed to work on same.

5.5    The Consultant's monthly and final invoices to the Owner shall include a detailed statement of services for which compensation is claimed and expenses for which reimbursement is claimed, together with such other substantiation as the Owner and/or its lender shall reasonably require including, but not limited to, time and material tickets, material invoices, cancelled checks, etc. The Owner has the right to request copies of the Consultant's payrolls and a level of effort report supported by time sheets. Each invoice shall include all claims by the Consultant for compensation and for expenditures incurred through the date of the invoice. The Consultant shall submit its final statement no later than sixty (60) days after final completion of the construction of the Project.

5.6    The Owner's payment for and/or approval of any report, plan, drawing and/or document shall not, under any circumstances, constitute or evidence a release of the Consultant from its responsibilities under this Agreement, including, among other things, with respect to the accuracy or code compliance of any plans and specifications prepared by the Consultant. The Consultant's acceptance of final payment under this Agreement, without any further documentation, shall constitute a complete release of the Owner by the Consultant of every claim (including liens), however described, against the Owner and/or the Project (including the real property comprising the Project).

CIC 000154

## Article 6 - The Owner's Responsibilities

6.1     The Owner designates David Weissy as its representative who will be authorized to act on its behalf with respect to the Project. Notwithstanding the foregoing, any decisions or authorizations which impact the construction budget, including the Consultant's compensation under this Agreement, must be approved in writing by Yoel Shargian on behalf of the Owner. The Owner, or such authorized representative, shall render decisions in a timely manner, as is reasonable under the circumstances, with respect to documents submitted by the Consultant, provided that, in no event, shall the Owner have less than ten (10) days to respond.

6.2     The Consultant shall request from the Owner any other information it deems necessary to carry out its obligations under this Agreement.

## Article 7 - Insurance

7.1     The Consultant shall comply with the insurance coverage requirements set forth in Exhibit C.

## Article 8 - Indemnification

8.1     To the fullest extent permitted by law, the Consultant shall indemnify, defend, and hold harmless the Owner and its parent company, corporations, subsidiary and affiliated companies including joint ventures and partnerships and their respective agents, consultants, principals, members, partners, directors, direct and/or indirect owners, officers and employees from and against lawsuits, claims, causes of action, damages, losses, interest, judgments, liens and expenses (including but not limited to reasonable attorney's fees and legal costs, disbursements and expenses), for personal or bodily injury, sickness, disease or death or injury to or destruction of tangible property arising out of the performance of the services by the Consultant under this Agreement.  This indemnification shall survive completion of the Project. With regard to any and all claims or lawsuits against Owner or its parent, subsidiary or affiliated companies by any employee of Consultant or employee of Consultant's subcontractor, sub consultant or vendor or brought by anyone for whose acts either Consultant or its subcontractor, sub consultant or vendor may be liable, the indemnification obligation under this Agreement shall not be limited in any way by the amount or type of damages, compensation or benefits payable by or for the Consultant or its subcontractor, sub consultant or vendor under workers' compensation acts, disability benefit acts or other employee benefit acts

8.2     Consultant agrees that if it hires any subcontractors, sub consultants or vendors to perform work at the Project it will do so by way of a written and executed contract which shall be immediately provided to Owner before subcontractor, sub consultant or vendor can perform any work at the Project and shall be subject to Owner's written approval.  Consultant agrees and understands that purchase orders will not be used and absent an approved written contract with its subcontractor, sub consultant or vendor said subcontractor, sub consultant or vendor will not be allowed on the premises of the Project.

8.3     The obligations of the Consultant under this Article shall survive acceptance of the Work and final payment to the Consultant.

8.4     Notwithstanding anything herein to the contrary, in no event shall either party be liable to the other, nor shall either party make any claim for any special, indirect, incidental or consequential damages of any kind or nature whatsoever arising out of or in any way connected to the Project or to this Agreement.  This mutual waiver shall include, but is not limited to, loss of

6

use, loss of profit, loss of business, loss of income, loss of reputation or any other consequential damages that either party may have incurred from any cause of action including negligence, strict liability, breach of contract or breach of strict or implied warranty.

## Article 9 - Termination and Suspension

9.1     The Owner may, upon seven (7) calendar day's written notice to the Consultant, terminate this Agreement without cause.  The Consultant shall, upon receipt of such notice, cease all Work on the Project.  In the event of such a termination for convenience, the Consultant shall be compensated for services performed to the date of termination as set forth in this Agreement and those performed during transition of services, if any, to another consultant designated by the Owner or their assigns. If work on the entire Project is suspended and the Project is resumed within six (6) months after suspension, the Consultant will resume Work in accordance with this Agreement within fourteen (14) days of the Consultant's receipt of written notice without claiming any additional compensation.

9.2     If this Agreement is terminated, abandoned or suspended under Section 9.1, the Consultant shall immediately provide to the Owner copies of all plans, drawings, specifications, models, calculations and other Work Product as set forth in Article 4, created or used by the Consultant or its consultants in the performance of any obligations under this Agreement.

9.3     The Owner may terminate this Agreement for cause, upon written notice and without delay, if the Consultant is adjudged bankrupt, makes a general assignment for the benefit of its creditors or if a receiver is appointed on account of its insolvency, or if the Consultant violated any federal, state or local law applicable to its performance under this Agreement.  Further, the Owner may default the Consultant and terminate this Agreement, also for cause, if the Consultant defaults under any provision of this Agreement, including those requiring timely performance of the Consultant's responsibilities hereunder, and it shall fail to cure such default within seven (7) days after written notification or, if such default cannot be cured within seven (7) days, then if the Consultant shall fail to commence to cure such default within seven (7) days or shall fail to diligently pursue the cure thereafter. The Consultant shall remain liable to the Owner for all damages suffered by it by reason of any such failure in accordance with applicable law.  In the event of the Consultant's failure to perform fully in accordance with this Agreement, the Owner may elect to permit the Consultant to continue to perform without waiving its right to terminate the Consultant for breach or default, and the Consultant shall be liable to the Owner for damages in accordance with applicable law.

9.4     Termination, suspension or abandonment by the Owner, under either Section 9.1 and/or 9.3, shall not give rise to any cause of action or claim against the Owner for any damages of any nature whatsoever, or for extra compensation or loss of anticipated profits.  Further, in the event that the Owner terminates the Consultant for default or breach under Section 9.3, which termination is later shown to be unlawful or without basis, that termination shall be immediately converted, without further notice or action, to a termination for convenience under Section 9.1. Termination of this Agreement for any reason shall not release the Consultant from any of its obligations under this Agreement existing at the time of termination, except for its obligation to complete its services under this Agreement, nor will it increase the Owner's potential liability beyond what it would otherwise be pursuant to applicable law.

9.5     If a good faith dispute arises between the Owner and the Consultant with respect to the Consultant's compensation or any other term of this Agreement, the Consultant shall continue to

CIC 000156

fully perform under this Agreement if the Owner makes timely payment of undisputed fees and reimbursements in accordance with Article 5.

9.6     In the event of termination or suspension of the Project for any reason, Consultant shall be compensated for any undisputed Services properly rendered up to the date of termination or suspension.

**Article 10 - Cooperation with the Owner's Financing Effort**

10.1     The Owner may assign this Agreement to a lender or investor providing financing to the Project. For the purposes of this Agreement, "Lender" shall mean any institution providing financing or favorable tax treatment in connection with the construction of the Project, and shall include a savings bank, savings and loan association, commercial bank, trust company, investment bank, brokerage company, credit union, insurance company, college, university, real estate investment trust, or pension fund or equity investor. The Consultant shall execute a Consent to Assignment in the form required by the Lender.

10.2     The Consultant agrees that, if the Owner shall default under the provisions of this Agreement or under any agreement between the Owner and the Lender that would give the Consultant the right to terminate this Agreement, the Consultant shall continue to perform its obligations under this Agreement for the Lender if the Lender shall cure any such default by the Owner within sixty (60) days after notice from the Consultant to the Lender. The Lender shall agree in writing to perform all obligations of the Owner after the date the Lender succeeds to the Owner's rights and obligations. If requested to do so by the Lender, the Consultant will confirm to the Lender its commitment to continue performance.

10.3     The Consultant further acknowledges that the Lenders for the Owner may have the right to (i) review the progress of the Consultant's services under this Agreement and to approve payments under this Agreement or changes to its scope, price or schedule; (ii) confirm that the parties have fully complied with the requirements of this Agreement; (iii) confirm that the Owner has fully complied with the financing agreements for the respective Condominium Units as such agreements relate to the Consultant's services; or (iv) require the Consultant to execute estoppel certificates, attornment agreements and collateral assignments, among other things. Additionally, the Consultant understands that the Owner may be required to obtain the Lender's approval before taking any action or issuing any approval contemplated by this Agreement. The Consultant may be required to perform its obligations under this Agreement for the benefit of and to the satisfaction of the Lender as well as the Owner. The Consultant shall make such minor changes, modifications or amendments to this Agreement as may be reasonably requested by the Owner acting at the request of any Lender or as requested by any such Lender.

**Article 11 - Successors and Assigns**

11.1     This Agreement shall be binding upon the Owner, the Consultant and their respective successors, assigns and legal representatives. It is nevertheless understood that the Owner has made this Agreement to secure the professional services of the Consultant, and the Consultant may not assign, subcontract or otherwise delegate its responsibilities or rights under this Agreement without the prior written consent of the Owner. Consent by the Owner may be withheld with or without a reason.

11.2     The Owner may assign this Agreement to a Lender as set forth in Section 10.1 upon fifteen (15) days written notice to the Consultant. The Lender shall have all of the Owner's

8

CIC 000157

rights under this Agreement, including, but not limited to, the right to terminate this Agreement. The Consultant acknowledges and understands that all rights under this Agreement flow to the Owner and agrees that the Consultant will look solely to the Owner for any and all obligations of the Owner under this Agreement.

**Article 12 - Other Conditions**

12.1    The Consultant acknowledges the unique need of the Owner with regard to maintaining the confidentiality of all information, reports, drawings, studies, data, financial information (including budgets, costs, reports and lender details) and other information generated in connection with the Project by reason of the important need for the Owner's security, privacy of data, proprietary data and systems, etc. The Consultant agrees to work within a system of confidentiality established by the Owner. The right to release any information relating to the Project and to determine the form, content and timing of the release of such information shall belong exclusively to the Owner. The Consultant will not divulge any information concerning the Project to anyone without the Owner's prior written consent, provided that the Consultant may disclose information as necessary to the appropriate governmental authority in an application for a permit, approval or clearance.

12.2    This Agreement shall be governed by the laws of the State of New York, both as to interpretation and performance. The Consultant hereby (i) irrevocably consents, for itself and its legal representatives, partners, successors and assigns, to the jurisdiction and venue of the Courts of the State of New York, County of New York for all purposes in connection with any action or proceeding which arises from or relates to this Agreement and (ii) waives its right to a trial by jury.

12.3    Notwithstanding anything to the contrary contained herein, Owner and Consultant agree that their sole and exclusive claim, demand, suit, judgment or remedy against each other shall be asserted against each other's corporate entity and not against each other's shareholders, principals, directors, officers or employees.

12.4    The language in this Agreement shall be construed according to its customary meaning within the construction industry in the New York City metropolitan area. Whenever used, the singular number shall include the plural, and the plural the singular, and the use of any gender shall be applicable to all genders.

12.5    The Consultant acknowledges that it is acting as an independent contractor, that it is solely responsible for its actions or inactions and that no document, action or assertion shall be construed to create an employment or agency relationship between the Owner/Construction Manager and the Consultant. The Consultant is not authorized to enter into contracts or agreements on behalf of the Owner or Construction Manager or to otherwise create obligations of the Owner or Construction Manager to third parties.

12.6    The Article headings herein are for convenience and reference only, and in no way define or limit the scope and contents of this Agreement or in any way affect its provisions.

12.7    No action or proceeding shall lie or be maintained by the Consultant against the Owner, Construction Manager or any Lender upon any claim arising out of or based upon this Agreement or by reason of any act or omission or any requirements relating to the giving of notices or information required hereunder, unless such action or proceeding shall be commenced within one (1) year after issuance of a Temporary Certificate of Occupancy for the Project or, if this Agreement is earlier terminated, within one (1) year following the date of such

CIC  000158

earlier termination. This provision shall not be deemed or construed to modify any other provision hereof relating to waivers of claims by the Consultant or to extend any period herein specifically provided for the initiation of an action relating hereto. Excluding any and all third party claims, causes of action by the Owner against the Consultant pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitation shall commence to run not later than either the date of Substantial Completion or the date of issuance of the final Certificate of Occupancy for acts or failures to act occurring after Substantial Completion.

12.8  All notices shall be in writing and shall be delivered personally, by Federal Express, or by registered or certified mail, return receipt requested.

Notices to the Owner shall be addressed to:

> BROADWAY 371, LLC
> 575 Madison Avenue
> 22nd Floor
> New York, NY 10022
> Attention:    Mr. David Weissy
>               Mr. Yoel Shargian
>               Mrs. Sheara Arbit, Esq.

Notices to the Consultant shall be addressed to:

> GZA GeoEnvironmental of New York
> 104 W 29th Street, 10th Fl.
> New York, NY 10001
> Attention: Cassandra Wetzel

12.9  No waiver of default hereunder shall be construed as a waiver of any subsequent breach.

12.10  Consultant is fully aware that it must immediately, within forty-eight (48) hours, provide notice in the form of a written incident/accident report to the Owner and Construction Manager when an employee, subcontractor or sub consultant of Consultant has been involved in an incident/accident relating in any way to the Work and/or the Project.  The incident/accident report will provide the Owner and Construction Manager with the following information: (1) the date of the incident/accident, (2) specific details describing the incident/accident, (3) the identities of who was involved in the incident/accident and their relation to the Project/Work, (4) the dates of birth and contact information (i.e. address, phone number, email address, etc.) of anyone involved in the incident/accident, (5) whether anyone was injured, and if so, whom (6) how they were injured, (7) the extent of their injury, (8) the name, position and contact information of any witnesses to the incident/accident, and (9) the name, position, contact information and signature of the person reporting the incident/accident.

12.11  The persons signing this Agreement, by doing so represent respectively that they are fully authorized to sign this Agreement on behalf of the Owner and the Consultant.

12.12  The Consultant shall not attempt, in any fashion, to influence improperly the discharge by any employee of the Owner or by any representative of any governmental body, of their duties and obligations.  Any such attempt shall be considered a material breach of this Agreement.

12.13  The Consultant shall not permit drug or substance abuse by any of its employees, or any employees of its sub-companies, vendors and/or suppliers, and it shall fully and promptly

CIC 000159

comply, at its own expense, with every rule, regulation and program initiated by the Owner and/or Construction Manager with respect to this subject matter.

12.14  The Consultant shall not discriminate against anyone, including its own employees, subcontractors, vendors, sub consultants and/or suppliers, on the basis of race, creed, age, sex, color, national origin or disability, and shall comply with all applicable federal, state and local non-discrimination laws and regulations and with the Owner's specific regulations and policies against discrimination.

12.15  This Agreement constitutes the entire understanding of the parties concerning the Project and supersedes all prior negotiations, statements, instructions, representations or agreements, either oral or written.  Any and all services performed by the Consultant heretofore in anticipation of entering into this Agreement are hereby merged into this Agreement.

12.16  This Agreement may be amended only by a written instrument expressly stated to be an amendment and signed by the Owner and the Consultant. In the event of conflict, inconsistency or confusion between the provisions of this Agreement and any exhibit, attachment or other document incorporated by reference to this Agreement, the terms and conditions of this Agreement shall exclusively control in all respects.

12.17  If any one or more of the provisions of this Agreement are, for any reason, held to be invalid, illegal or unenforceable in any respect, such illegality, invalidity or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

12.18  The Consultant recognizes and agrees that a default by the Owner under this Agreement shall not support or justify suspension or termination of performance by the Consultant, or the assertion of a claim or demand by the Consultant (to the extent allowed by, and subject to the terms and conditions of, this Agreement) with respect to, other projects. Further, the Consultant agrees to look solely to the Owner's interest in the Project for the satisfaction of any right, remedy or lien of the Consultant, or for the collection of a judgment (or other judicial process), requiring the payment of money.

12.19  The parties hereby acknowledge that they are executing this Agreement freely, voluntarily, and with full knowledge of its terms and consequences, and that each party has been afforded the time and opportunity to consult with an attorney of its choosing concerning the terms of this Agreement, and that each party has, in fact consulted with its attorney concerning the terms of this Agreement.  As such, this Agreement shall be deemed equally drafted by each party.

12.20  This Agreement may be executed in counterparts. Facsimile and/or .PDF signatures are deemed to be equivalent to original signatures for purposes of this Agreement.

This Agreement is entered into as of the date and year first written above.

BROADWAY 371, LLC                          GOLDBERG   ZOINO   ASSOCIATES   OF   NEW
                                           YORK PC

By:_____              By: Cassandra A Wetzel
        Yoel Shargian                          Cassandra Wetzel

11

**EXHIBIT A**

CONSULTANT'S PROPOSAL DATED DECEMBER 3, 2012
REVISED BY OWNER ON DECEMBER 5, 2012

CIC 000161

E X H I B I T A

| PROJECT NAME : 371 Broadway Instrumentation | DATE : 12/03/12 |
| REF NUMBER: 41.P000211.13 Rev.2 | PREPARED BY : SGH |
| LOCATION : New York, NY | APPROVED BY : CAW |

### REVISED QUOTATION FOR INSTRUMENTATION INSTALLATION SERVICES

#### SCOPE OF WORK :

Our understanding of the project is based on our discussions with Mr. John S. Deerkoski, P.E., a set of shoring plans provided by John S. Deerkoski, P.E., and Associates (JSDA) stamped September 10.2012, and our site meeting with you and your team on the morning of October 19, 2012. We understand that the existing three story concrete superstructure will be dismantled to the basement level, the foundation is to be redesigned and completed before the superstructure is to be reconstructed to the third floor. It was noted that the two wood-framed multi-story structures that occupy the eastern portion of the lot will be demolished when the concrete superstructure reaches three stories and the building will be 19-stories tall when completed.

GZA will provide the labor and material for the installation of geostructural instrumentation in order to monitor 365 Broadway to the south and 373-375 Broadway to the north, for a duration defined by the Contractor. The scope of work has been developed in accordance with Support of Excavation drawing SOE-001.00 dated September 10, 2012. Our scope of work includes the installation of two automated motorized total stations (AMTS), 60 L-Bar mini-prisms and six back-sight prisms. The duration of the monitoring period has not been defined by the Contractor, we have provided unit pricing for the required instrumentation assuming a construction schedule of three months.

Prisms Per Building According to SOE-001.00 dated 9/10/12

| | Broadway Side (1st Flr, 3rd & Roof) | Franklin Place Side (1st Flr, 3rd & Roof) | South Wall (1st Flr, 3rd & Roof) | North Wall (1st Flr, 3rd & Roof) | Backsight Prisms | Total |
|---|---|---|---|---|---|---|
| 365 Broadway | 6 | 6 | - | 15 | - | 27 |
| 373-375 Broadway | 9 | 9 | 15 | - | - | 33 |
| - | - | - | - | - | 6 | 6 |
| | | | | Estimated Total | | 66 |

GZA will setup a custom project specific website, which will be accessible from any internet connection. The central data management (CDM) website will process and store all monitoring data for the duration of the project. A graphical interface would be created to allow the depiction of the calculated coordinate data on a plan and up to 4 section views. The CDM will have the ability to send out emails when movement exceeds the alert levels established for the project by the Contractor. GZA will generate a monthly report in a PDF format summarizing monitoring prism movement. Our report will be signed and stamped by a New York State Professional Engineer for your records.

Since the scope of work has not been fully developed, we expect work to be completed in stages and we made necessary assumptions in order to complete this proposal. We have assumed that the Contractor or owner will provide access to mount both AMTS, monitoring prisms, and back-sight prisms. We would provide 120 volt (10 Amp) electrical supply to both AMTS units. We have excluded any costs associated with procuring equipment such as man-lifts in order to install the instrumentation and monitoring prisms. The locations of the monitoring prisms as shown on drawing SOE-001.00 may have to be adjusted in the field to make sure there is a line of sight with the AMTS. We assume that a minimum of ten prisms will be installed per visit or a half day installation fee will be charged to the Contractor for that visit. The monitoring prisms will be monitored on a one hour frequency, 24 hours per day, seven days per week. Access to properties for instrumentation installation will be the responsibility of the Contractor, however we will work with the Contractor to provide project specific instrumentation work plans detailing the instrumentation installation prodecures.

We have not included costs for site specific safety training. Instruments damaged during construction activities will be the responsibility of the Contractor to repair and/or replace as directed by others. Additional work outside our defined scope of services will be billed on a Time and Material basis in accordance with the attached schedule of fees. The removal of backsight and monitoring prisms will be performed by the Contractor. The Contractor will be refunded 25% of the prism installation fee for prisms that are returned to us in working condition.

It was noted that others are providing preconstruction documentation services, vibration and crack gage monitoring for the adjacent buildings.

| Item No. | Description | Quantity | Unit | Unit Bid Amt ($) | Extended Total ($) |
|---|---|---|---|---|---|
| 1 | **AMTS Monitoring System (Installed)** | | | | |
| | Automated Motorized Total Station (AMTS) with data logger, accessible via cell phone, CDM set- | 2 | EA | $6,800.00 | $13,600 |
| | Furnish and Install L-Bar Mini Prism | 60 | EA | $250.00 | $15,900 |
| | Furnish and Install Back-Sight | 6 | EA | $350.00 | $2,100 |
| | | | | | |
| | Return Visit Work to Install Prisms or Provide Support upon Request (Half Day Rate) | 0 | EA | $500.00 | $0 |
| | Return Visit Work to Install Prisms or Provide Support upon Request (Full Day Rate) | 0 | EA | $1,000.00 | $0 |
| | Monthly Monitoring Reports (Optional) | 0 | MO | $250.00 | $0 |
| | Monthly Equipment Rental - AMTS Rental, Cell Access & CDM (Month 1 to 6) | 6 | MO | $3,400.00 | $20,400 |
| | Monthly Equipment Rental - AMTS Rental, Cell Access & CDM (Month >6) | 0 | MO | $2,550.00 | $0 |
| | | | | Estimated Total: | $51,100 |

#### SCHEDULE AND CONDITIONS :

This proposal assumes that a mutually acceptable schedule of fieldwork will be developed. This quotation is based on the anticipated scope of work outlined above, which represents our present judgment as to the level of effort required. In the lack of an agreed upon subcontract, our conditions of engagement are described on the Attached Terms and Conditions. If you have any questions or required additional information, please contact Cassandra Wetzel or Douglas Roy at 212-594-8140.

#### ACCEPTANCE :

Name: _____     Date: _____

Title: _____     Signature: _____

Attachment-Terms & Conditions-

CIC 000162

| PROJECT NAME : 371 Broadway Instrumentation | DATE : 12/06/12 |
| RFP NUMBER: 41.P000211.13 | PREPARED BY : SGH |
| LOCATION : New York, NY | APPROVED BY : CAW |

**REVISED QUOTATION FOR INSTRUMENTATION INSTALLATION SERVICES**

**SCOPE OF WORK :**

1. Pre-construction surveys of the NYCT tunnel structure for an approximate length of 100 feet in the tunnel tube closest to the property. We will observe and document visible cracks, separations, spalling and evidence of water leakage. Visual observations of the exposed walls, ceilings, floors, columns and beams will be documented. Photographs will be taken to provide evidence of observed conditions. All observations will be made from readily accessible areas without the use of ladders, lifts, etc. Our report will include documentation of the observations made, printed color photographs, and a CD containing digital copies of the photographs and a video taken in the tunnel. No post-construction survey will be performed. Work will require an MTA escort to complete.

2. GZA will provide and install one prism every 15 to 25 feet along the tunnel closest to the site (est. 3). The points (mini-prisms) will be mounted directly to the NYCT tunnels structure at locations shown on the approved SOE Drawings. At this time we have assumed that three mini prisms will be installed on the interior structural members of the NYCT tunnel at 25-foot interval. We will survey each of the locations for initial baseline readings. Subsequent readings will be compared to the baseline for comparison. A data letter will be provided with the results of the survey. We will establish a site datum for reference. Work will require an MTA escort to complete.

3. DISCUSS SEISMO INSTALL> GZA will setup a central data management (CDM) website, which will be accessible from any internet connection. The CDM will store all vibration data for the duration of the project. The CDM will have the ability to send out emails when vibration exceeds the alert levels established for the project. The seismograph data will be sent via cell modem to GZA computer servers. The remote operation of the seismographs enables each unit to be relocated to other vibration sensitive areas of the site, if additional monitoring locations are needed. Access to seismographs will be required for maintenance and service. Access with MTA escort needed for the initial set up and occidiational manituace only.

We have assumed that 371 Broadway LLC or others will provide the following:

Permission from NYCT to install monitoring prisms, reference prisms and seismographs at the above mentioned locations.
120VAC power to the seismograph.
Any labor claimed by local unions.
All required NYCT flagging and coordination of flagging staff
All work FOR EACH INDIVIUAL TASK can be completed during one shift of operation and flagging.
Any engineering analysis of monitoring prism movement or vibration issues.

In addition we have assumed the following:
All costs for replacement of prisms or damaged equipment by others will be reimbursed on a time and materials basis.

| Item No. | Description | Quantity | Unit | Unit Bid Amt ($) | Extended Total ($) |
|---|---|---|---|---|---|
| 1 | *Preconstruction Survey* | | | | |
| | Survey of tunnel adjacent to site on Broadway and report | 1 | LS | $2,200.00 | $2,200 |
| 2 | *Survey Monitoring* | | | | |
| | Install up to three prisms in tunnel and set baseline reading. Manual survey. | 1 | LS | $1,800.00 | $1,800 |
| | Reading event for prisms. Manual survey and report, if needed. (Requires flagman escort) | 0 | EA | $1,800.00 | $0 |
| 3 | *Vibration Monitoring* | | | | |
| | Install/remove seismograph (3 Instruments) | 2 | LS | $1,400.00 | $2,800 |
| | Equipment Rental (3 Seismographs) | 6 | MO | $1,200.00 | $7,200 |
| | Maintenance (If Required) | 3 | EA | $900.00 | $2,700 |
| | Remote CDM Set Up, Access and Report | 1 | LS | $1,200.00 | $1,200 |
| | Monthly monitoring report (Survey and Monitoring) (Optional) | 0 | MO | $1,600.00 | $0 |
| | | | | **Estimated Total:** | **$17,900** |

**SCHEDULE AND CONDITIONS :**

This proposal assumes that a mutually acceptable schedule of fieldwork will be developed. This quotation is based on the anticipated scope of work outlined above, which represents our present judgment as to the level of effort required. In the lack of an agreed-upon subcontract, our conditions of engagement are described on the Attached Terms and Conditions. If you have any questions or required additional information, please contact Cassandra Wetzel or Douglas Ray at 212-594-8140.

**ACCEPTANCE:**

Name: _____     Date: _____

Title: _____     Signature: _____

CIC 000163

| | | |
|---|---|---|
| PROJECT NAME : 371 Broadway | | DATE : December 3, 2012 |
| RFP NUMBER : 41.P000211.13 Rev. 1 | | PREPARED BY : CAW |
| LOCATION : New York, NY | | APPROVED BY : CAW |

### QUOTATION FOR GEOTECHNICAL DESIGN SERVICES

*SCOPE OF WORK :*

1.    GZA will review the available project documents (reports, plans, and drawings) prepared by others to prepare a pile calculation package for an 60 T design load, vertical mini pile for this project. The piles will be designed in accordance with current edition of the New York City Building Code. Our analysis will be prepared under the supervision and stamped by a registered New York Professional Engineer. GZA will work with the existing design set prepared by Becker Engineering (2011) that have already been reviewed and approved by the MTA. Any changes or modifications of these drawings will be noted by GZA on a revised drawing set based on the Becker drawings.

2.    GZA will provide an engineer to monitor the proposed vertical pile load test. Our engineer will be on site up to 12 hours to work with the contractor to monitor and document the installation of the test pile and monitor the results of the load test during two separate events (24 hours total). We understand that the test will be performed using the NYCBC 48 hr hold in accordance with the piling specification. We have assumed GZA will be present during load up of the pile, but not load hold. GZA will prepare a pile load test report following completion of the test. We have assumed that one test will be monitored and one report will be prepared for the project. GZA will perform one site visit by project manager and attendance at one project meeting.

3.    GZA will provide a professional engineer on a daily basis to observe the installation of the piles during construction as required by the NYCDOB. Our engineer will oversee the pile operations and prepare a pile installation log. Following completion of the work, GZA will prepare and sign off on the required TR-5 for the NYCDOB.

In conjunction with the performance of the foregoing Services, Consultant shall provide the following Submittals/Deliverables (Documents) to the owner:

Pile Design Calculation Package
Pile Load Test Results Report
NYCDOB TR-4 and TR-5 Sign Off As Required for Piles

| Item No. | Description | Quantity | Unit | Unit Bid Amt ($) | Extended Total ($) |
|---|---|---|---|---|---|
| 1 | Geotechnical Pile Design Services | 1 | EA | $6,300.00 | $6,300 |
| 2 | Load Test Observation and Pile Load Test Report | 1 | EA | $4,000.00 | $4,000 |
| 3 | Pile Observation Services (P.E. Daily) and TR-5 | 12 | DAY | $950.00 | $11,400 |
| | | | | **Estimated Total:** | $21,700 |

*SCHEDULE AND CONDITIONS :*

This proposal assumes that a mutually acceptable schedule of fieldwork will be developed. This quotation is based on the anticipated scope of work outlined above, which represents our present judgment as to the level of effort required. ~~In the lack of an agreed upon subcontract, our conditions of engagement are described on the Attached Terms and Conditions.~~ If you have any questions or required additional information, please contact Cassandra Wetzel at 212-594-8140.

*ACCEPTANCE:*

Name: _____     Date: _____

Title: _____     Signature: _____

· Attachment: Terms & Conditions

CIC 000164



# TERMS AND CONDITIONS FOR PROFESSIONAL SERVICES
## INCLUDING SITE INVESTIGATION, REMEDIATION, GEOTECHNICAL, CONSTRUCTION, AND TESTING

© 2008 by GZA GeoEnvironmental, Inc.

| | |
|---|---|
| Client ("You"): | El Ad Group |
| Proposal No: | 41.P0002| 043 |
| Site: | 371 Broadway, New York |

These Terms and Conditions, together with GZA's Proposal, make up the Agreement between GZA and you, Client, named above.

*BEFORE SIGNING THE PROPOSAL, BE SURE YOU READ AND UNDERSTAND THE PARAGRAPHS ENTITLED "INDEMNIFICATION" AND "LIMITATION OF REMEDIES" WHICH DEAL WITH THE ALLOCATION OF RISK BETWEEN YOU AND GZA.*

1.  **Services.** GZA will perform the services set forth in its Proposal and any amendments or change orders authorized by you. Any request or direction from you that would require extra work or additional time for performance or would result in an increase in GZA's costs will be the subject of a negotiated amendment or change order.

2.  **Standard of Care; Warranties.**

    a.  GZA will perform the services with the degree of skill and care ordinarily exercised by qualified professionals performing the same type of services at the same time under similar conditions in the same or similar locality.
    b.  GZA warrants that its construction services will be of good quality, free of faults and defects and in conformance with the Proposal.
    c.  **EXCEPT AS SET FORTH IN SUBSECTIONS 2a AND 2b, ABOVE, NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING WARRANTY OF MARKETABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IS MADE OR INTENDED BY GZA'S PROPOSAL OR BY ANY OF GZA'S ORAL OR WRITTEN REPORTS.**
    d.  GZA assigns to you any manufacturers' warranties of equipment or materials purchased from others, to the extent they are assignable, and your sole recourse will be against the manufacturer. Full risk of loss of materials and equipment will pass to you upon delivery to the Site, and you will be responsible for insuring and otherwise protecting them against theft and damage.

3.  **Payment.**

    a.  Except as otherwise stated in the Proposal, you will compensate GZA for the services at the rates set forth in the applicable Proposal, amendment or change order; reimburse its expenses, which will include a communication fee calculated as a percentage of labor invoiced; and pay any sales or similar taxes thereon.
    b.  Any retainer specified in GZA's Proposal shall be due prior to the start of services and will be applied to the final invoice for services. GZA will submit invoices periodically, and payment will be due within 20 days from invoice date. Overdue payments will bear interest at 1½ percent per month or, if lower, the maximum lawful rate. GZA may terminate its services upon 10 days' written notice anytime your payment is overdue on this or any other project and you will pay for all services through termination, plus termination costs. You will reimburse GZA's costs of collecting overdue invoices, including reasonable attorneys fees.

4.  **Your Responsibilities.**

    a.  Except as otherwise agreed, you will secure the approvals, permits, licenses and consents necessary for performance of the services. If you are the owner or operator of the Site, you will provide GZA with all documents, plans, information concerning underground structures (including but not limited to utilities, conduits, pipes, and tanks), information related to hazardous materials or other environmental or geotechnical conditions at the Site and other information that may be pertinent to the services or, if you are not the owner or operator of the Site, you agree to make reasonable efforts to obtain these same documents and provide them to GZA. Unless otherwise indicated in writing, GZA will be entitled to rely on documents and information you provide.
    b.  If you use the services of a construction manager at the Site, you agree to use best and reasonable efforts to include in your agreement(s) with the construction contractor provisions obligating the latter:
        (i)  to indemnify and hold harmless, to the fullest extent permitted by law, you and GZA, its officers, employees and principals, for or on account of any claims, liabilities, costs and expenses, including attorneys' fees, arising out of or relating to the design or implementation of construction means, methods, procedures, techniques, and sequences of construction, including safety precautions or programs, of the contractor, or any of its subcontractors or any engineer engaged by it;

CIC 000165

(ii) to name you and GZA as additional insureds under general liability and builder's risk insurance coverages maintained by the contractor, or any of its subcontractors; and

(iii) to require that all of its subcontractors agree and be bound to the obligations set forth in (i) and (ii) above.

c.  In the event that you are unable to secure such provisions in the agreement(s) with the construction contractor, you shall promptly notify GZA and GZA shall have the opportunity to negotiate with you reasonable substitute risk allocation and insurance indemnities and protections.

**5.  Right of Entry; Site Restoration.**  You grant GZA and its subcontractor(s) permission to enter the Site to perform the services.  If you do not own the Site you represent and warrant that the owner has granted permission for GZA to enter the Site and perform the services; you will provide reasonable verification on request; and you will indemnify GZA for any claims by the Site owner related to alleged trespass by GZA or its subcontractors. GZA will exercise reasonable care to limit damage to landscaping, paving, systems and structures at the Site that may occur and you agree to compensate GZA for any restoration it is asked to perform, unless otherwise indicated in the Proposal.

**6.  Underground Facilities.**  GZA's only responsibility under this Section will be to provide proper notification to the applicable state utility "Call-Before-You-Dig" program. You further agree to assume responsibility for and to defend, indemnify and hold harmless GZA with respect to personal injury and property damages due to GZA's interference with subterranean structures including but not limited to utilities, conduits, pipes, and tanks:

(i)  that are not correctly shown on any plans and information you or governmental authorities provide to GZA; or

(ii) that are not correctly marked by the appropriate utility.

**7.  Reliance.**  The services, information, and other data furnished by you shall be at your expense, and GZA may rely upon all information and data that you furnish, including the accuracy and completeness thereof. You acknowledge that the quality of the services provided by GZA is directly related to the accuracy and completeness of the information and data that you furnish to GZA. GZA's REPORTS ARE PREPARED FOR AND MADE AVAILABLE FOR YOUR SOLE USE. YOU ACKNOWLEDGE AND AGREE THAT USE OF OR RELIANCE UPON THE REPORT OR THE FINDINGS IN THE REPORT BY ANY OTHER PARTY, OR FOR ANY OTHER PROJECT OR PURPOSE, SHALL BE AT YOUR OR SUCH OTHER PARTY'S SOLE RISK AND WITHOUT ANY LIABILITY TO GZA.

**8.  Lab Tests and Samples.**  GZA is entitled to rely on the results of laboratory tests using generally accepted methodologies.  GZA may dispose of samples in accordance with applicable laws 30 days after submitting test results to you unless you request in writing for them to be returned to you or to be held longer, in which case you will compensate GZA for storage and/or shipping beyond 30 days.

**9.  GZA Professionals.**  GZA employees or consultants may act as licensed, certified or registered professionals (including but not limited to Professional Engineers, Licensed Site or Environmental Professionals, or Certified Industrial Hygienists collectively referred to in this section as ("GZA Professionals") whose duties may include the rendering of independent professional opinions. You acknowledge that a federal, state or local agency or other third party may audit the services of GZA or other contractor/consultant(s), which audit may require additional services, even though GZA and such GZA Professionals have each performed such services in accordance with the standard of care set forth herein. You agree to compensate GZA for all services performed in response to such an audit, or to meet additional requirements resulting from such an audit, at the rates set forth in the applicable Proposal, amendment or change order.

**10.  Hazardous Materials; GZA Is Not a Generator".**  Before any hazardous or contaminated materials are removed from the Site, you will sign manifests naming you as the generator of the waste (or, if you are not the generator, you will arrange for the generator to sign).  You will select the treatment or disposal facility to which any waste is taken.  GZA will not be the generator or owner of, nor will it possess, take title to, or assume legal liability for any hazardous or contaminated materials at or removed from the Site.  GZA will not have responsibility for or control of the Site or of operations or activities at the Site other than its own.  GZA will not undertake, arrange for or control the handling, treatment, storage, removal, shipment, transportation or disposal of any hazardous or contaminated materials at or removed from the Site, other than any laboratory samples it collects or tests. You agree to defend, indemnify and hold GZA harmless for any costs or liability incurred by GZA in defense of or in payment for any legal actions in which it is alleged that GZA is the owner, generator, treater, storer or disposer of hazardous waste.

**11.  Limits of GZA's Responsibility.**  GZA will not be responsible for the acts or omissions of contractors or others at the Site, except for its own subcontractors and employees.  GZA will not supervise, direct or assume control over or the authority to stop any contractor's work, nor shall GZA's professional activities nor the presence of GZA or its employees and subcontractors be construed to relieve any that GZA has authority over or responsibility for the means, methods, techniques, sequences or procedures of construction, for work site health or safety precautions or programs, or for any failure of contractors to comply with contracts, plans, specifications or laws.  Any opinions by GZA of probable costs of labor, materials, equipment or services to be furnished by others are strictly estimates and are not a guarantee that actual costs will be consistent with the estimates.

CIC 000166

**12. Changed Conditions.**

You recognize the uncertainties related to environmental and geotechnical services, which often require a phased or exploratory approach, with the need for additional services becoming apparent during the initial services. You also recognize that actual conditions encountered may vary significantly from those anticipated, that laws and regulations are subject to change, and that the requirements of regulatory authorities are often unpredictable.

b.  If changed or unanticipated conditions or delays make additional services necessary or result in additional costs or time for performance, GZA will notify you and the parties will negotiate appropriate changes to the scope of services, compensation and schedule.

c.  If no agreement can be reached, GZA will be entitled to terminate its services and to be equitably compensated for the services already performed. GZA will not be responsible for delays or failures to perform due to weather, labor disputes, intervention by or inability to get approvals from public authorities, acts or omissions on your part, or any other causes beyond GZA's reasonable control, and you will compensate GZA for any resulting increase in its costs.

**13. Documents and Information.** All documents, data, calculations and work papers prepared or furnished by GZA are instruments of service and will remain GZA's property. Designs, reports, data and other work product delivered to you are for your use only, for the limited purposes disclosed to GZA. Any delayed use, use at another site, use on another project, or use by a third party will be at the user's sole risk, and without any liability to GZA. Any technology, methodology or technical information learned or developed by GZA will remain its property. Provided GZA is not in default under this Agreement, GZA's designs will not be used to complete this project by others, except by written agreement relating to use, liability and compensation.

**14. Electronic Media.** In accepting and utilizing any drawings, reports and data on any form of electronic media generated by GZA, you covenant and agree that all such electronic files are instruments of service of GZA, who shall be deemed the author and shall retain all common law, statutory law and other rights, including copyrights. In the event of a conflict between the signed documents prepared by GZA and electronic files, the signed documents shall govern. You agree not to reuse these electronic files, in whole or in part, for any purpose or project other than the project that is the subject of this Agreement. Any transfer of these electronic files to others or reuse or modifications to such files by you without the prior written consent of GZA will be at the user's sole risk and without any liability to GZA.

**15. Confidentiality; Subpoenas.** Information about this Agreement and GZA's services and information you provide to GZA regarding your business and the Site, other than information available to the public and information acquired from third parties, will be maintained in confidence and will not be disclosed to others without your consent, except as GZA reasonably believes is necessary: (a) to perform its services; (b) to comply with professional standards to protect public health, safety and the environment; and (c) to comply with laws and court orders. GZA will make reasonable efforts to give you prior notice of any disclosure under (b) or (c) above. Information available to the public and information acquired from third parties will not be considered confidential. You will reimburse GZA for responding to any subpoena or governmental inquiry or audit related to the services, at the rates set forth in the applicable Proposal, amendment or change order.

**16. Insurance.** During performance of the services, GZA will maintain workers compensation, commercial general liability, automobile liability, and professional liability/contractor's pollution liability insurance. GZA will furnish you certificates of such insurance on request.

**17. Indemnification.** You agree to hold harmless, indemnify, and defend GZA and its affiliates and subcontractors and their employees, officers, directors and agents (collectively referred to in this paragraph as "GZA") against all claims, suits, fines and penalties, including mandated cleanup costs and attorneys' fees and other costs of settlement and defense, which claims, suits, fines, penalties or costs arise out of or are related to this Agreement or the services, except to the extent they are caused by GZA's negligence or willful misconduct.

**18. Limitation of Remedies.**

a.  To the fullest extent permitted by law and notwithstanding anything else in this Agreement to the contrary, the aggregate liability of GZA and its affiliates and subcontractors and their employees, officers, directors and agents (collectively referred to in this paragraph as "GZA") for all claims arising out of this Agreement or the services is limited to $50,000 or, if greater, 10% of the compensation received by GZA under this Agreement.

b.  You may elect to increase the limit of liability by paying an additional fee, such fee to be negotiated prior to the execution of this Agreement.

c.  Any claim will be deemed waived unless received by GZA within one year of substantial completion of the services.

d.  GZA will not be liable for lost profits, loss of use of property, delays, or other special, indirect, incidental, consequential, punitive, exemplary or multiple damages.

e.  GZA will not be liable to you or the Site owner for injuries or deaths suffered by GZA's or its subcontractors' employees.

f.  You will look solely to GZA for your remedy for any claim arising out of or relating to this Agreement, including any claim arising out of or relating to alleged negligence or errors or omissions of any GZA principal, officer, employee or agent.

CIC 000167

**19. Disputes**

a.  All disputes between you and GZA shall be subject to non-binding mediation.
b.  Either party may demand mediation by serving a written notice stating the essential nature of the dispute, the amount of time or money claimed, and requiring that the matter be mediated within forty-five (45) days of service of notice.
c.  The mediation shall be administered by the American Arbitration Association in accordance with its most recent Construction Mediation Rules, or by such other person or organization as the parties may agree upon.
d.  No action or suit may be commenced unless mediation has occurred but did not resolve the dispute, or unless a statute of limitation period would expire if suit were not filed prior to such forty-five (45) days after service of notice.

**20. Miscellaneous**

a.  Massachusetts law shall govern this Agreement.
b.  The above terms and conditions regarding Limitation of Remedies and Indemnification shall survive the completion of the services under this Agreement and the termination of the contract for any cause.
c.  Any amendment to these Terms and Conditions must be in writing and signed by both parties.
d.  Having received these Terms and Conditions, your authorization to commence services, your actions, or your use of the Report or Work Product constitutes your acceptance of them.
e.  This Agreement supersedes any contract terms, purchase orders or other documents issued by you.
f.  Neither party may assign or transfer this Agreement or any rights or duties hereunder without the written consent of the other party.
g.  Your failure or the failure of your successors or assigns to receive payment or reimbursement from any other party for any reason whatsoever shall not absolve you, your successors or assigns of any obligation to pay any sum to GZA under this agreement.
h.  These Terms and Conditions shall govern over any inconsistent terms in GZA's Proposal.
i.  The provisions of this Agreement are severable; if any provision is unenforceable it shall be appropriately limited and given effect to the extent it is enforceable.
j.  The covenants and agreements contained in this Agreement shall apply to, inure to the benefit of and be binding upon the parties hereto and upon their respective successors and assigns.

CIC 000168

## <u>EXHIBIT B</u>

PROJECT SCHEDULE

CIC 000169

## EXHIBIT C

1.1    Consultant and its subcontractors, sub consultants or vendors at all times shall maintain in full force and effect the following insurance coverage's and understands that access to the Project will not be granted nor can work be performed if such insurance coverage's are not in effect:

    1.1.1    Commercial General Liability Insurance covering both premises/operations/ongoing operations and completed operations, in the amount of $1,000,000 per occurrence with a $2,000,000 general aggregate. Consultant and its subcontractors, sub consultants or vendors shall verify in writing from its insurance broker or agent that it's General Liability policy does not have an Exclusion for construction and/or work performed on a residential project or townhouse or condominium development and shall also verify that said policy does not have an exclusion for claims brought by injured workers referred to commonly in NY as action over claims. Coverage must be written on an occurrence based policy form and must maintain products and completed operations coverage for a period of at least six (6) years following completion of work.

    1.1.2    Automobile Liability Insurance covering all owned, non-owned and hired automobiles with a limit of $1,000,000 per occurrence.

    1.1.3    Umbrella Liability Insurance with limits of $5,000,000 per occurrence on a following form basis.

    1.1.4    Workers' Compensation including Employer's Liability Insurance with minimum limits of $1,000,000 each accident for bodily injury by accident; $1,000,000 policy limit for bodily injury by disease and $1,000,000 each employee for bodily injury by disease and Disability Benefits Insurance with limits as required by law. Any contractors or subcontractors, consultants or vendors based outside of the State of New York must verify in writing from its insurance broker that its worker's compensation insurance covers work it performs in the State of New York.

    1.1.5    Professional Liability Insurance with limits of at least $2,000,000 available for each claim and $ 3,000,000 in the aggregate. This insurance coverage shall be effective from and after the commencement date of services rendered by the Consultant or its vendors. This coverage is to be maintained for a period of five (5) years after the date of final payment hereunder.

1.2    Consultant and each of its subcontractors, subconsultants and/or vendors are obligated to name as Additional Insured's as required by contract: Broadway 371, LLC, El-Ad Group, Ltd, El Ad US Holding, Inc., Design Construct International, Inc., Bank Leumi USA, its successors and/or assigns, ATIMA, and the Project Lenders of record and their respective assigns, and the respective parent and subsidiary and affiliated companies and partners, directors, officers, employees, agents and representatives of the additional insured's (collectively, the Additional Insured's) which shall be included and named as additional insured's on a "primary and non-contributory" basis on the insurance policies listed Articles 1.1.1, 1.1.2 and 1.1.3 above. Consultant shall require its subcontractor, sub consultant or vendor to indemnify and name the Additional Insured's on its policies. Owner shall have the right to amend the named additional insured's as needed.

CIC 000170

**1.3**   All insurance policies shall be procured by Consultant and its subcontractors, sub consultants and vendors or caused to be procured by its insurance consultants in forms and by insurance carriers licensed in New York with a minimum AM Best rating of "A-" or better or with carriers that are acceptable at the discretion of Owner.

**1.4**   Consultant and its subcontractors, sub consultants or vendors shall provide a Certificate of Insurance with the relevant Additional Insured Endorsement (CG 20 10 11/85 or its equivalent) **attached to the certificate of insurance** at the time this Agreement is executed but no later than the first day of work on the job site.  All Additional Insured Endorsements must be of a type that ensures that the Additional Insured's are covered for both ongoing and completed operations.  Additional Insured Endorsements limited to ongoing operations only will cause the Certificate of Insurance to be rejected and Consultant or its subcontractor, sub consultant or vendor will not be allowed on the job site until the Certificate of Insurance has been amended.   In the event of cancellation, non-renewal or material change, Owner shall receive thirty (30) days prior written notice of said cancellation, non-renewal or material change via certified mail from the Consultant.  Neither Consultant nor its subcontractors, sub consultants, and/or vendors will be allowed on to the Project site if certificates of insurance have not been furnished to Owner.

A copy of all Certificates of Insurance should be immediately forwarded to Owner's representative to Elizabeth Rychling, Vice President Risk Management, 3128 Las Vegas Blvd South, Las Vegas, NV 89109 or emailed to her at erychling@theplazahotellv.com.   Any questions concerning insurance requirements or certificates of insurance should be addressed to her directly at 702-405-5507.

Consultant and their subcontractors, sub consultants or vendors must provide updated Certificates of Insurance to Owner in the event any one of its insurance policies as required above renews while work is in progress.  Consultant will not be paid unless all certificates of insurance are on file with Owner and are up to date.

**1.5**   In the event that Consultant or its subcontractors, sub consultants or vendors fail to maintain the coverage's or limits as required herein, Owner, at its option, may affect such insurance as an agent of Consultant or its sub consultants.  Any premiums paid, therefore, by Owner to affect such coverage shall be payable by Consultant or offset by or against any compensation owed to Consultant under this Agreement.

**1.6**   Consultant agrees to include in each of its required policies (except Professional Liability), where applicable, a waiver of its insurers' right of subrogation against Owner. Consultant shall require of their subcontractors, sub consultants or vendors similar waivers of subrogation in favor of the other parties enumerated herein.

15

CIC 000171